O'NEILL, APPELLANT, v. YELLOWSTONE IRRIGATION
DISTRICT ET AL., RESPONDENTS.

(No. 3,068.)

(Submitted January 15, 1912. Decided January 25, 1912.)

[121 Pac. 283.]

*Irrigation Districts—Constitution—District Judges—Delegation
of Powers—Res Adjudicata—Estoppel—Cost Bonds—Failure
to Furnish—Effect—Indebtedness—Bonds—Manner of Dis-
posal—Exchange for Property—Accrued Interest.*

Irrigation District—Constitution—District Judges—Nonjudicial Duties.
   1. *Held,* that Chapter 146, Laws of 1909, providing for the creation
   of irrigation districts, is not, in conferring certain alleged non-
   judicial powers and duties in that connection upon the district
   judge, violative of section 1, Article IV of the Constitution, which
   divides the powers of government into the legislative, executive and
   judicial departments and prohibits each from exercising any power
   properly belonging to either of the others.
Same.
   2. Where the principal powers conferred upon a district judge by
   an Act, the constitutionality of which is attacked on the ground that
   the powers thus bestowed are nonjudicial in character, contrary to
   section 1, Article IV, of the Constitution, are judicial, the fact that
   their exercise may incidentally require the performance of legislative
   or administrative functions does not impair the validity of the legis-
   lation conferring it.
Same—Bonds—Validity—Petitions—Sufficiency.
   3. Chapter 146, Laws of 1909, being silent as to any disqualifica-
   tion of persons, who are the owners of property which they desire

to sell to the district when created and thus specially interested in its creation, barring them from taking part in the proceedings leading to that end and the subsequent sale of bonds, their signatures on the petitions provided for by the Act did not invalidate the bonds.

Same—Bonds—Validity—*Res Adjudicata*—Estoppel.

4. In the absence of fraud in the proceedings taken pursuant to Chapter 146, Laws of 1909, the order of the court establishing the district and that directing the issuance of bonds are, unless appeals be taken from said orders within sixty and ten days, respectively, *res adjudicata*, and constitute an estoppel against thereafter litigating the validity of the bonds.

Same—Cost Bond—Failure to Furnish—Effect.

5. *Held*, that the giving of the bond required by section 2 of Chapter 146, Laws of 1909, not being a jurisdictional prerequisite, but designed as security for costs only in the event the irrigation district should not be organized, failure to give it did not affect the jurisdiction of the court in the premises, nor that of the commissioners appointed in pursuance of the Act to conduct the affairs of the district.

Same—Bonds—Signatures of Officers of District.

6. To make bonds authorized by the Act of 1909, *supra,* valid obligations, it was not necessary that they should be signed and attested, when issued to purchasers, by the persons acting as president and secretary, respectively, of the district at the time of the creation of the district; the signature and attest of the officers serving at the time of their issuance were sufficient.

Same—Bonds—When Deemed "Issued."

7. The word "issued," as used in section 42 of the Act of 1909 referred to above, in declaring that "All bonds *issued* * * * shall be signed," etc., *held* to mean delivery to the purchaser, and not to have any reference to the date fixed by the commissioners as the beginning of the time for which they run.

Same—Bonds—Manner of Disposal—Discretion.

8. Where a municipality is given power to issue and sell bonds, without restriction as to the mode by which and the terms upon which they may be sold, the authorities are left free to dispose of them at such prices as they can obtain; where, however, certain restrictions are imposed in this respect, they must be observed.

Same—Bonds—Sale—Exchange for Property.

9. *Held*, that an exchange of irrigation district bonds for property at its cash value was a sale of them, within the meaning of the Act of 1909, *supra,* and that the commissioners were authorized, no restrictions in this respect having been imposed upon them by the statute, to so dispose of them on the same terms as if sold for cash.

Same—Bonds—Sale—Accrued Interest—Coupons.

10. Under section 11 of Chapter 146, Laws of 1909, providing that irrigation district bonds shall not be sold for less than ninety per cent of their par value and accrued interest thereon to date of delivery, the commissioners, in selling and delivering such bonds without first detaching the interest coupons due at that time, exceeded their authority.

*Appeal from District Court, Rosebud County; Sydney Fox, Judge.*

ACTION by Thomas J. O'Neill against the Yellowstone Irriga-
tion District and the Sanders Co-operative Ditch Company, to
test the validity of Chapter 146 of the Laws of 1909, providing
for the creation, organization, and government of irrigation
districts.   From a judgment in favor of defendants, the plain-
tiff appeals.   Reversed and remanded.

*Mr. George A. Horkan,* for Appellant, submitted a brief and
argued the cause orally.

The plaintiff, as a taxpayer and land owner in the proposed
irrigation district, can maintain this action, and each and every
question raised by the pleadings in the district court is prop-
erly before this court.   (*Sechrist* v. *Rialto Irr. Dist.,* 129 Cal.
640, 62 Pac. 261; *Miller* v. *Perris Irr. Dist.,* 92 Fed. 263; *Central
Irr. Dist.* v. *De Lappe,* 79 Cal. 351, 21 Pac. 825.)

We respectfully call to the attention of this court the fact
that the irrigation district law of this state, in so far as it
relates to the organization and establishment of such districts,
is materially different from the "Wright Law" of California or
other irrigation district Acts passed by western states, in this:
That the irrigation district law of this state attempts to convey
the power to organize irrigation districts to the district court
or judge thereof, while the "Wright Law" and similar laws
give that power to the board of supervisors.   The legislature,
by thus attempting to improve upon the "Wright Law," to our
mind exceeded its constitutional authority by attempting to con-
vey a power and impose a duty upon the "district courts or
judges thereof," which in its very nature is not a judicial duty
or power, but is in fact and in law a legislative or administrative
function.   If such be the case, it necessarily follows that said
portion of said irrigation district law is void, as being a viola-
tion of section 1, Article IV, of the Constitution.   (See *In re
Weston,* 28 Mont. 212, 72 Pac. 514; *State* v. *Barker,* 116 Iowa,
96, 93 Am. St. Rep. 232, 89 N. W. 204, 57 L. R. A. 244, and
cases cited; *Smith* v. *Strother,* 68 Cal. 194, 8 Pac. 852; *Board
of Supervisors* v. *Todd,* 97 Md. 247, 99 Am. St. Rep. 438, 54

Atl. 963, 62 L. R. A. 809; *Case of Supervisors of Election,* 114 Mass. 247, 19 Am. Rep. 341; *Ex parte Griffiths,* 118 Ind. 83, 1C Am. St. Rep. 107, 20 N. E. 513, 3 L. R. A. 398; see, also, note to *People* v. *Freeman,* [80 Cal. 233, 22 Pac. 173], 13 Am. St. Rep. 125.)

The complaint sets forth that the petition for the organization of the district, and also the petition for the issuance of bonds, contains the signatures of the stockholders of the Sanders Co-operative Ditch Company, whose property the petition for the organization of said district conclusively showed was to be acquired by said district, and which the records show was afterward acquired by it.   Did they, as stockholders of said Sanders Co-operative Ditch Company, having in view the sale of their property to the proposed irrigation district, have a right under the law to sign the two petitions above mentioned?   We submit that their interests as such stockholders disqualified them from signing said petitions, for in law the signing of said petitions indirectly, if not directly, amounts to the company purchasing the consent to organize the district, which is against public policy.   (See *Doane* v. *Chicago City Ry. Co.,* 160 Ill. 22, 45 N. E. 507, 35 L. R. A. 592; Dillon on Municipal Corporations, 5th ed., secs. 773, 1232.)

No bond or undertaking accompanied or was filed with the petition for the organization of the respondent irrigation district, or otherwise furnished or filed.   It is our contention that in order to give the district court or judge thereof jurisdiction to organize an irrigation district, the filing of a bond, as required by the law itself, is a necessary and material prerequisite. (*Casey* v. *Burt County,* 59 Neb. 624, 81 N. W. 851; *Central Irr. Dist.* v. *De Lappe,* 79 Cal. 351, 21 Pac. 827; *In re Bonds of the Madera Irr. Dist.,* 92 Cal. 296, 27 Am. St. Rep. 106, 28 Pac. 272, 14 L. R. A. 768.)

Was it the duty of the officers who were in office at the time the bonds of the district were printed to sign and attest the same, or is it the duty of the officers who were such at the date of the sale and delivery of said bonds to sign and attest the

same? We believe the question raised depends entirely upon the interpretation to be placed upon the word "issued" as used in section 42 of the Act. The courts give the word two different meanings, *i. e.,* the arbitrary date fixed as the beginning of the term for which bonds, notes, *etc.,* run, without reference to the precise time when convenience or the state of the market may permit of their sale or delivery, and the time when they are actually delivered to the purchaser. (See *Yesler* v. *City of Seattle,* 1 Wash. 308, 25 Pac. 1014; *Gage* v. *McCord,* 5 Ariz. 227, 51 Pac. 979; *Corning* v. *Board of Commissioners,* 102 Fed. 57, 42 C. C. A. 154; *Perkins County* v. *Graff,* 114 Fed. 441, 52 C. C. A. 243; *Brownell* v. *Town of Greenwich,* 114 N. Y. 518, 22 N. E. 24, 4 L. R. A. 685; *State* v. *Pierce,* 52 Kan. 521, 35 Pac. 19; *Central Irr. Dist.* v. *De Lappe,* 79 Cal. 351, 21 Pac. 827.) We believe the legislature, in the use of the word in sections 42, 43 and 44 of the law, meant the actual delivery of the bonds to the purchaser. This being so, we contend that the bonds should be signed and attested by the president and secretary of the district, who were such officers at the time of the sale and delivery of the bonds.

A proper construction of section 44 of the Act displays the fact that the bonds of an irrigation district cannot be disposed of at less than par value, except where said bonds are issued, negotiated and sold for cash. (*Stowell* v. *Rialto Irr. Dist.,* 155 Cal. 215, 100 Pac. 248; *Leeman* v. *Perris Irr. Dist.,* 140 Cal. 540, 74 Pac. 24.)

*Messrs. Gunn, Rasch & Hall* submitted a brief in behalf of Respondents; *Mr. Carl Rasch* argued the cause orally.

It is true, as pointed out by appellant, that the Act in question here differs from the "Wright Law" of California, in that the latter requires the petition for the organization of an irrigation district in the state of California to be presented to the board of supervisors, instead of filing it with the clerk of the district court, as is required under the Montana law; but, it is plain, the question of the validity of the Act in question here

and the validity of a statute such as obtains in California
is necessarily governed and must be determined by the same
rule in both cases.   In fact, the contention made here of an
unauthorized delegation of legislative power to a department
or officer precluded from exercising such power was likewise
urged against the validity of the "Wright Law," but the attack
proved futile and the law was sustained.   (*Fallbrook Irr. Dist.*
v. *Bradley,* 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; see,
also, *Field* v. *Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed.
294; *Young* v. *Salt Lake City,* 24 Utah, 321, 67 Pac. 1066.)
The same argument which is made here to support the conten-
tion that the Act in question is violative of the Constitution
was made in *State* v. *Crosby,* 92 Minn. 176, 99 N. W. 636.   The
Act of the legislature assailed in that case provided for the
organization and establishment of drainage systems, and to
effect the purpose of the Act, prescribed a method of procedure
quite similar to the method adopted here for the establishment
of irrigation districts.   The validity of the Act, however, was
sustained.   So in *Sanderlin* v. *Luken,* 152 N. C. 738, 68 S. E.
225, it was held that an Act conferring on the clerk of the court
power to establish a drainage district was not invalid as dele-
gating legislative powers and duties to the judiciary, such
duties and power being of a judicial nature.   In *State* v. *Dis-
trict Court,* 30 Nev. 225, 94 Pac. 70, a statute authorizing the
district court, upon application of a majority of the qualified
electors, being also taxpayers within the limits of any city
or town proposed by the petitioners to be incorporated, to enter
a decree declaring such city or town incorporated under the
provisions of the Act, and requiring the court to designate its
classification and appoint commissioners, was upheld against the
attack made upon it upon the ground that it delegated legis-
lative powers to the judicial department.   Precisely the same
ruling was made upon practically the same state of facts by the
supreme court of Colorado in *People* v. *Fleming,* 10 Colo. 553, 16
Pac. 299, and to the same effect are the decisions of the courts
in *Town of Edgewater* v. *Liebhardt,* 32 Colo. 307, 76 Pac. 366;

*Callen* v. *City of Junction City,* 43 Kan. 627, 23 Pac. 652, 7 L. R. A. 736; *Wickham* v. *City of Alexandria,* 23 S. D. 556, 122 N. W. 597; *Nash* v. *Fries,* 129 Wis. 120, 108 N. W. 210; *State* v. *Superior Court,* 42 Wash. 491, 85 Pac. 264; *Forsythe* v. *City of Hammond,* 68 Fed. 774.

That those signers of the petition for the establishment of the district, and for the confirmation of the proceedings for the issuance of bonds, who were also, at the time, stockholders in the ditch company, were, individually, holders of title or evidence of title to lands within the district, independently of their interest in the property of the ditch company, and belonged to the class of persons designated in the statute as competent to make the application and institute the appropriate proceedings for the creation of an irrigation district, and for the confirmation of the proceedings had for the issue of bonds in accordance with the provisions of the act, is not disputed. Their right to co-operate with other land owners is in nowise curtailed or restricted by any provision of the statute, but, on the contrary, is quite plainly implied and recognized. Sections 1, 4 and 35, Laws of 1909, clearly evince the legislative intent that all the owners of land within a proposed irrigation district should be afforded the privileges and be given the right to avail themselves of the provisions of the Act, and, by a submission to and an acceptance of the burdens which it imposes, secure the benefits which it confers.

But, aside from this, it is now too late for anyone to question the legality of the proceedings, either those preliminary and leading up to the order and judgment of the court establishing the district, or those had for the purpose of conferring authority of the board to issue bonds. The finding and order of the district court creating the district are, by the very terms of the statute, made "conclusive upon all the owners of lands within the district that they have assented to and accepted the provision of the Act"; and the order is "final unless appealed from to the supreme court within sixty days from the date of entry." (Section 4.) Likewise the decree of confirmation is

now "forever conclusive upon all the world as to the validity of said bonds," and can "never be called into question in any court in the state." (Section 41; see *Miller* v. *Perris Irr. Dist.,* 85 Fed. 693; *Crall* v. *Irrigation Dist.,* 26 Pac. 787; *People* v. *Irrigation Dist.,* 128 Cal. 477, 61 Pac. 86; *Herring* v. *Irrigation Dist.,* 95 Fed. 705; *Knowles* v. *Irrigation Dist.,* 16 Idaho, 217, 101 Pac. 811; *Oregon Short Line R. Co.* v. *Irrigation Dist.,* 16 Idaho, 578, 102 Pac. 904.)

*Casey* v. *Burt County,* 59 Neb. 624, 81 N. W. 851, cited by appellant, seems to sustain the contention that a bond shall accompany the petition for the organization of an irrigation district and is an indispensable prerequisite for jurisdictional purposes to enable the court to act upon the application. The rule of construction laid down in that case cannot be adopted, because the Act itself prescribes a different one. It must "be liberally construed so as to effect the objects and purposes" of the Act (section 66), and, besides, "any error, irregularity or omission which does not affect the substantial rights of the parties" must be disregarded (section 60). In *State* v. *Taylor,* 224 Mo. 393, 123 S. W. 892, the ruling made by the Nebraska court was commented upon and discussed. It was held that the failure to give the statutory bond in a proceeding like this is not a jurisdictional matter.

It does not appear when the bonds were actually executed by Richardson and Collins, nor does it appear when they actually ceased to be officers of the district. It is nowhere shown or alleged that the bonds were not actually signed and executed by the president and secretary of the board while Richardson and Collins still legally held those offices, but the contention is that inasmuch as the bonds delivered to the Sanders Co-operative Ditch Company were not issued until July 5, 1910, at which time Richardson and Collins had ceased to be officers of the district, and the remainder of the bonds had not been issued at all, none of them have been legally executed, inasmuch as under the requirements of the statute, the signing and sealing of the bonds must be done by the president and secretary, re-

spectively, of the district who are such at the time of the delivery of the bonds. Presumptively, in point of law (Jones on Evidence, pocket ed. 1911, secs. 41–46, 50), as well as impliedly, upon the face of the record, the fact is established that the bonds in question were actually executed by the persons who, at the time of the signing and sealing of the bonds, held the office of president and secretary, respectively, of the district. * * * Nor is there anything in the statute which requires that the execution of the bonds should be deferred until they are sold and about to be delivered, but quite the contrary would seem to be contemplated. Not only is there no requirement imposed that the bonds should be executed at the time of delivery, but the inhibition against the disposition of the bonds for less than ninety per cent of their par value and "accrued interest thereon to date of delivery" necessarily implies that they may be validly executed at any time before sale and delivery and that it need not be deferred until they are disposed of.

It is suggested, however, that the conditions existing at the time of the delivery of the bonds should determine the manner in which, and the person by whom, they should be executed, and it is intimated that the legislature, by making use of the word "issued," must have meant the actual delivery of the bonds to the purchaser, and if that be true, then the bonds should be signed and attested by the president and secretary of the district who were such officers at the time of the sale and delivery of the bonds. We fail to perceive any force in the argument. There is no necessary connection between the execution of the bonds and their sale and delivery so as to make the two one and the same. (See *Perkins County* v. *Graff*, 114 Fed. 444, 52 C. C. A. 243; *City of Austin* v. *Valle* (Tex. Civ.), 71 S. W. 414.)

Both of these cases are cited by appellant, but it is palpable that they do not in any way sustain his contention that the bonds should be executed by the persons who held the offices of president and secretary, respectively, of the district at the time

the bonds were actually sold and delivered.   The same is to a still greater degree true of *Gage* v. *McCord,* 5 Ariz. 227, 51 Pac. 977.

And what was said regarding the significance of the term "issue" in *Perkins County* v. *Graff,* and *City of Austin* v. *Valle, supra,* conforms to the views of the New York court of appeals, as expressed in *Brownell* v. *Greenwich,* 114 N. Y. 518, 22 N. E. 24, 4 L. R. A. 685, also cited in appellant's brief, where the court said: "The question now arises whether the bonds of the plaintiff were actually issued upon or after May 12, 1871, the date when said amendment took effect.   They bear the date of March 25, 1871, and are presumed to have been executed at that time; but executing is not issuing; for they might be fully executed, but never issued."

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

The plaintiff is a resident of Rosebud county.   He is the owner of farming land situate therein, and within the boundaries of the defendant, the Yellowstone Irrigation District, subject to taxation for the purpose of maintaining the district and paying the principal and interest on an indebtedness of $250,000, which it has contracted, or is about to contract, by issuance and sale of its bonds.   The district was organized under authority of the Act of the Eleventh Legislative Assembly (Session Laws 1909, Chap. 146, p. 254), entitled "An Act to provide for the creation, organization, government and extension of irrigation districts," *etc.*   Relief is sought by plaintiff in his own behalf and in behalf of all other land owners similarly situated.   He recites in his complaint with much detail the proceedings resulting in the organization of the district, as well as those of its board of managers in the conduct of its affairs, from the time of its organization to the bringing of this action.   He brings in question the validity of the legislation itself on constitutional grounds, and therefore the legal capacity of the district.   Upon the assumption that he cannot successfully maintain his conten-

tion in this regard, he also assails the validity of the proceedings had for the establishment of the district, as well as the various acts of its governing board in connection with the administration of its affairs, particularly with reference to the issuance and disposition of the bonds mentioned to provide funds necessary to accomplish the purpose of the organization. The Sanders Co-operative Ditch Company, a corporation, hereafter referred to as "the company," is made defendant for the purpose of having declared invalid a transaction between it and the district, whereby the board of commissioners of the district, in consideration of a conveyance to it by the company of all of its property, consisting of water rights, canals, flumes, headgates, rights of way, franchises, *etc.*, situate within the district, delivered to the company $83,500 of the bonds of the district. The district court sustained a general demurrer to the complaint, and entered judgment dismissing the action. The plaintiff has appealed.

In order to understand the controversy it will be necessary to refer to some of the provisions contained in the Act. Section 1 provides that a majority in number of the holders of title or evidence of title to lands susceptible of irrigation from the same general source and by the same general system of works, such holders of title or evidence of title also representing a majority in acreage, may propose the establishment and organization of an irrigation district. The latter part of the section declares what evidence of title shall be sufficient, and by way of proviso excludes such lands as are already under irrigation or can be irrigated more readily from other sources, unless the owners of such lands give their consent in writing to have them included.

Section 2 provides that the proceedings for the establishment of the district shall be initiated by filing with the clerk of the district court a petition signed by the requisite number of owners, setting forth (1) the name of the proposed district; (2) a general description of the lands to be included; (3) the names of the owners, and, if any owner is not a resident of the county or one of the counties in which the district lies, his postoffice

address; (4) the source from which the lands included are to be irrigated, and the character of the works, water rights, canals, and other property which it is the purpose to acquire for the irrigation of the included lands; and (5) a prayer that the lands described be organized as an irrigation district. The petition must be accompanied by a map or plat of the district, and a bond or undertaking, to be approved by the district court or judge, conditioned to pay all costs of the proceeding in case the organization of the proposed district is not effected.

Section 3 provides that the court or judge shall fix the time and place for the hearing of the petition, and direct a notice to be given by the clerk, by publication for two weeks in a newspaper in the county in which the district lies of a copy of the petition and a notice of the time and place of hearing. If any portion of the district lies in another county, then publication shall also be made in such other county. Publication must begin at least thirty days prior to the date of hearing. The clerk is required to mail copies of the petition and notice to all nonresident owners of lands lying within the district. Proof of notice must be made by affidavit of the publisher.

Section 4 permits adjournments of the hearing from time to time for further notice or good cause, and also amendments to be made to the petition, either by the petitioners or other person or persons interested. All persons interested may appear and contest the necessity or utility of the proposed district or any part thereof. The court is required to hear and determine whether all the requirements of sections 1, 2, and 3 have been complied with, and for that purpose shall hear all competent and relevant testimony. It must be determined what lands shall be included and what excluded, the court making such changes in the boundaries of the proposed district as may be necessary for that purpose. If it is found that the petition substantially complies with the requirements of sections 1, 2, and 3, an order must be made, as follows: (1) Setting forth the finding and allowing the petition; (2) establishing the district; (3) giving an accurate description of the lands included; (4) dividing the

district into three divisions; and (5) appointing three competent persons as commissioners, one for each division, to conduct the affairs of the district.   This order is made conclusive upon all the owners of land in the district, and is "final unless appealed from to the supreme court within sixty days from the date of entry."   Within thirty days a copy of it must be recorded with the county clerk and recorder of the county wherein the lands included within such district are situated; provided that there shall be omitted from such copy a description of lands not situated in the county in which such copy is filed.   It is declared that the district so established is a public corporation for the promotion of the public welfare, and that the lands included therein shall constitute all the taxable and assessable property of such district for the purposes of the Act.

The following sections declare the qualifications which the commissioners must possess; prescribe the manner of their organization; fix their compensation; define their duties and powers; and embody directions as to the course to be pursued in electing commissioners from time to time, in levying taxes for the maintenance of the district or for the purchase or acquisition of such property as may be necessary to effect the purposes of the corporation, and the mode to be pursued in the issuance and sale of bonds whenever it becomes necessary to obtain funds for the immediate use of the district.   Reference to them, so far as may be necessary, will be made hereafter.

1. Counsel for plaintiff contends that the statute is violative of section 1, Article IV, of the Constitution, in that it confers [1] powers and imposes duties upon the district court or the judge thereof which are legislative or executive in their character, or, in other words, that the powers conferred are nonjudicial.   The provision of the Constitution referred to divides the powers of government into distinct departments, the legislative, executive, and judicial, and prohibits each department from exercising any powers properly belonging to either of the others. Hence, if the view advanced by counsel is correct, the district court was without authority to organize the district, the district

has no legal existence, and the court should have sustained the action.   As was pointed out in *State ex rel. Schneider* v. *Cunningham,* 39 Mont. 165, 101 Pac. 962: ''The purpose of the provision is to constitute each department an exclusive trustee of the power vested in it, accountable to the people alone for its faithful exercise, so that each may act as a check upon the other, and thus may be prevented the tyranny and oppression which would be the result of a lodgment of all power in the hands of one body.'' Each department must therefore refrain from asserting a power that does not belong to it, for the assertion of such power is equally a violation of the trust.   (*Id.*)   And it is apparent that one department cannot lawfully delegate any of its powers to another or to any person or body.    (*State* v. *Holland,* 37 Mont. 393, 96 Pac. 719; *In re Weston,* 28 Mont. 207, 72 Pac. 512; 6 Am. & Eng. Ency. of Law, 2d ed., 1022; Cooley's Constitutional Limitations, 163; *Case of Borough of West Philadelphia,* 5 Watts & S. (Pa.) 281.)

In this Act there is no delegation of legislative functions. The legislation is complete in itself.   In enacting it the legislature prescribed the conditions which must be complied with in order to effect the organization of the corporation, and has declared that, when this compliance has been ascertained by the procedure prescribed for that purpose, the corporation is organized with the powers described in the Act.    (*Field* v. *Clark,* 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294.)   In this case there was under consideration the validity of an Act of Congress which conferred upon the President the power to suspend its operation under certain conditions, to be ascertained by him. The contention was made that this was an unauthorized delegation of legislative power.   The contention was overruled, the court holding that what the President was required to do was not the making of the law, but in execution of it as the ''agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect.''

Again, in *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369, the court had under consideration

the "Wright Law" of California (Sess. Laws Cal., Extra. Sess. 1887, p. 29), similar in purpose and character to the law under consideration here. The power vested in the court under our own Act was under that Act vested in the board of supervisors of the county. One of the contentions was that this amounted to a delegation of legislative power, but in overruling this contention the court said: "We do not think there is any validity to the argument. The legislature delegates no power. It enacts conditions, upon the performance of which the corporation shall be regarded as organized with the powers mentioned and described in the Act."

In *Locke's Appeal,* 72 Pa. 491, 13 Am. Rep. 716, it was said: "The legislature cannot delegate its power to make a law; but it can make a law to delegate power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

In *Cincinnati, W. & Z. R. Co.* v. *Clinton County Commissioners,* 1 Ohio St. 88, the supreme court of Ohio said: "The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." Such laws are by no means uncommon. It was said by the supreme court of Pennsylvania in *Moers* v. *Redding,* 21 Pa. 202: "Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law." The following cases are to the same effect: *In re O'Brien,* 29 Mont. 530, 75 Pac. 196, 1 Ann. Cas. 373; *Young* v. *Salt Lake,* 24 Utah, 321, 67 Pac. 1066;

*State* v. *Crosby,* 92 Minn. 176, 99 N. W. 636; *State ex rel. Matson* v. *Superior Court,* 42 Wash. 491, 85 Pac. 264; *Town of Edgewater* v. *Liebhardt,* 32 Colo. 307, 76 Pac. 366; *State ex rel. Williams* v. *District Court,* 30 Nev. 225, 94 Pac. 70; *Callen* v. *City of Junction City,* 43 Kan. 627, 23 Pac. 652, 7 L. R. A. 736; *People ex rel. Rhodes* v. *Fleming,* 10 Colo. 553, 16 Pac. 298; *Nash* v. *Fries,* 129 Wis. 120, 108 N. W. 210; *Sanderlin* v. *Luken,* 152 N. C. 738, 68 S. E. 225. Some of these cases involve local option laws; others, statutes providing for the organization of cities and towns; others, laws creating drainage districts; still others involve the validity of statutes authorizing courts to add to municipal corporations areas of territory not embraced therein, or to detach such areas from them, but the principle underlying all of them is the same. . .

It is undoubtedly true that no case can be found in which a statute imposing purely legislative functions upon courts has been upheld; but, as shown by the cases cited, where the principal [2] power conferred is judicial in character, the fact that the exercise of the power so conferred may incidentally require the exercise also of legislative or administrative functions does not impair the validity of the legislation conferring it. The duty to determine the propriety of establishing irrigation districts, resting, as it does, upon public necessity, appertains exclusively to the law-making body. So, also, the mode by which they may be organized must be determined by it. But the ascertainment of the necessity or utility of establishing a particular district, as well as the solution of the question whether the conditions precedent have been complied with, involve judicial functions, the exercise of which is properly left to the courts. It is sufficient to sustain the law if the general power conferred is judicial, though it incidentally requires the performance of legislative and administrative duties. (*State* v. *Barker,* 116 Iowa, 96, 93 Am. St. Rep. 222. 89 N. W. 204, 57 L. R. A. 244; *Sanderlin* v. *Luken, supra; State ex rel. Matson* v. *Superior Court, supra.*)

The cases upon which counsel for plaintiff relies do not sustain his contention. The statute construed by this court in the

case of *In re Weston, supra,* cast upon the court the duty to ascertain whether a district judge was disqualified by reason of bias or prejudice, and to designate another to preside in his stead, whereas there was no provision of statute declaring bias or prejudice to be a disqualification. Hence this court was required to determine what is disqualifying bias or prejudice, and thus to perform purely legislative functions. So in *State* v. *Barker, supra,* the statute authorized the appointment of a board of waterworks trustees for cities of the first class, by the district court of the county in which such cities were located. It was properly held invalid because it required the performance of administrative duties and also deprived the cities of the right of local self-government. Other cases cited are distinguishable in similar respects.

2. As appears from the synopsis of sections 1 and 2 of the statute, the petition presented to the district court must be signed by a majority in acreage and in the number of holders of title to land which it is proposed to include in the district. Sections 40 to 48, inclusive, authorize the board of commissioners, after the district has been organized, to levy assessments for current purposes, and in proper cases to issue bonds to provide funds for the construction of irrigation canals and works, and to acquire the property necessary to accomplish the purposes of its organization. It appears from the petition for the organization of the district, a copy of which is attached to the complaint, that the property which it is proposed to acquire by the district consists of "water rights, canals, flumes, headgates, works, rights of way, franchises, and property comprising and including the entire gravity irrigation system now owned and operated by the Sanders Co-operative Ditch Company." After the organization of the district, upon petition by the requisite majority of the holders of title to lands in the district, the board of commissioners ordered the issuance of bonds of the district to the amount of $250,000 for the purpose of acquiring by purchase the property of the company and extending it so as to meet the requirements of the district. Both the petition for organization

and that for the issuance of bonds were signed by persons who are stockholders in the company. It is alleged in the complaint that these persons were disqualified by this special interest to sign either petition, and that, since their signatures were necessary to make up the legal majority of owners in each case, the district was not legally organized, or, in any event, that the board did not acquire jurisdiction to issue the bonds.

If we understand the contention of counsel, it is that, by reason of the fact that the stockholders of the company were [3] interested in effecting a sale of the property of the company to the district, they were thereby disqualified to take any part in the organization of the district or in any of the proceedings thereafter looking to a completion of the sale. This contention cannot be sustained for several reasons. The statute nowhere makes any discrimination against those who are owners of property in the district which it is necessary for it to acquire, because of any personal interest; nor does it impose any conditions which would preclude a person, possessing the qualifications prescribed by the Act, from participating in the creation and promotion of the district exactly in the same manner and to the same extent as any other holder of title to land therein. The theory of the Act is that in the organization of the district, which is to serve a public purpose, *viz.*, to "promote the prosperity and welfare of the people," all owners may participate. It declares the rule of construction which must be applied to effect its purpose. Its provisions shall be "liberally construed." (Section 66.)

It is not contended that any of the signers of the original petition were not possessed of the qualifications prescribed by the statute. This being so, and the statute being silent as to any disqualification by reason of any special interest, no one of them was to be denied participation in the organization by reason of such interest. The court would not have been authorized to declare such a disqualification and thus add a requirement not prescribed by the legislature. This would have been judicial legislation. The statute, therefore, by strong implication, recog-

nizes the right of all owners, whether interested in the property or system to be acquired, or not, to participate. The petition must set forth, generally, the source from which the lands in the proposed district are to be irrigated, and the character of the property proposed to be acquired. (Section 2.) The court must determine the necessity and utility of the proposed district upon the showing made at the hearing upon the petition, including other lands than those generally described, which can be irrigated from the same source upon written application by the owners, and excluding such as justice and right may require because they are already irrigated or can be irrigated more readily from other sources, or cannot be irrigated from the proposed system. (Section 4.) In effect the court judicially determines the propriety and feasibility of the proposed scheme as a whole, and gives the assent which the legislature authorizes it to give, to the acquisition of any property described in the petition, without regard to the ownership of it or the persons interested in it. In so formulating the legislation the law-making body eliminated the element of personal interest as a determining influence, and by doing so impliedly left all owners the right to participate in the organization. It also thus made it possible for the people to organize districts in many localities where such course would otherwise be impossible, by reason of the predominating number and influence of those who own the property which the proposed district must acquire; for if, in a given case, these persons should be held disqualified by reason of their interest, the district could not be organized, however much the minority number might desire it, because they could never obtain a majority of the owners in the district possessing the necessary qualifications to petition for the organization. The same considerations are to be taken into account touching the qualifications of those who sign the petition for the issuance of bonds. If the number of the owners who are not disqualified by reason of interest should be less than a majority of all owners in the district, the organization would be rendered ineffective because the district could never acquire the property necessary

to carry out its purpose. We know of no rule of law which declares that any person, who is otherwise qualified, may not take part in the organization of a municipality in which he expects to reside, by reason of any special interest he may have at stake, or which, for the same reason, precludes him from taking part in the conduct of its affairs after it is organized.

Aside from these considerations it is now too late to question the validity of the proceedings either preliminary to the order [4] of the court establishing the district, or those had for the purpose of authorizing the board of commissioners to issue bonds. By section 4 the finding and order of court establishing the district is made conclusive upon all the owners of lands included in it, and final unless an appeal be taken therefrom to this court within sixty days after its entry. Section 41 requires the board, within ten days after making its order directing the issuance of bonds, to present a petition to the district court for confirmation and ratification of its proceedings in connection with, and anterior to, its order directing the issuance of the bonds. Notice must be given and a hearing be had by the court of all persons whose rights may be affected by the issuance and sale of the bonds. The statements in the petition may be put in issue. The issues presented, if any, must be tried as issues in an ordinary action. The final judgment or order is conclusive unless an appeal be taken to the supreme court within ten days. The time during which an appeal may be taken from the orders in question having expired, neither of them, in the absence of allegation and proof of fraud procuring it, can now be called in question.

In *Miller* v. *Perris Irr. Dist.* (C. C.), 85 Fed. 693, the same contention, among others, was made as in this case, *viz.,* that the district has no legal existence because the petition for its organization had not been signed by the requisite number of freeholders. Judge Wellborn in overruling it, said: "I am further satisfied that, if the corporate existence of said district were open to complainant's attack, the decrees of the superior courts of San Bernardino county and San Diego county, approv-

ing the organization of said district, are conclusive against such attack.   *   *   *   Among the issues upon which the court passes in confirmation proceedings are the very ones presented by complainant in his bill, namely, whether or not the requisite number of *bona fide* freeholders signed the petition to the board of supervisors, and also whether or not due notice of such petition was given.   These issues the court must necessarily find in the affirmative before any order of confirmation will be reached; and it will be seen that, in some of the cases above cited, these two questions were the identical questions passed upon by the court. If the final order or decree in a proceeding for confirmation were *res adjudicata*, there would be an estoppel by judgment against litigating again the issues so adjudicated." (See, also, *People* v. *Irrigation Dist.*, 128 Cal. 477, 61 Pac. 86; *Herring* v. *Irrigation Dist.* (C. C.), 95 Fed. 705; *Knowles* v. *Irrigation Dist.*, 16 Idaho, 217, 101 Pac. 81; *Oregon Short Line R. Co.* v. *Irrigation Dist.*, 16 Idaho, 578, 102 Pac. 904.)

3. The petition for organization of the district was not [5] accompanied by the bond required by section 2, *supra.* The contention is made that because of this omission the district court failed to acquire jurisdiction, and hence the organization of the district was void *ab initio.*   There is no merit in this contention.   By its own terms the provisions of the Act are to be liberally construed in order to effect its object and purposes. (Section 66.)  "The court hearing any of the contests or proceedings herein provided for shall disregard any error, irregularity, or omission which does not affect the substantial rights of the parties to said action or proceeding."   Under this rule we must hold that the failure to file a bond did not affect the validity of the proceedings, unless the filing of it was a step necessary to give the district court jurisdiction.

In *Dakota County* v. *Cheney*, 22 Neb. 437, 35 N. W. 211, and in *Casey* v. *Burt County*, 59 Neb. 624, 81 N. W. 851, the supreme court of Nebraska adopted the view that the rule of strict construction should be applied to such legislation.   There the legislation under consideration was an Act authorizing the establish-

ment of drainage districts.   The court held that the bond, which the statute declared must accompany the petition addressed to the board of county commissioners, was a jurisdictional prerequisite.  In view of the provision of our statute, *supra,* however, we may not adopt this rule.   But aside from this, the bond is designed as security for costs only, and not to secure a party against loss by reason of a deprivation of some right or the imposition of some burden or restriction at the commencement of the proceeding and in advance of a trial and judgment.   In such cases the giving of a bond is a jurisdictional prerequisite which must be observed before process issues. . A cost bond has nothing to do with the merits of a case and is wholly collateral to them. Its purpose is to obligate the petitioners to pay the costs of the proceeding in case the organization of the district is not effected Therefore a defective bond may be amended (*In re Bonds of Madera Irr. Dist.,* 92 Cal. 296, 27 Am. St. Rep. 106, 28 Pac. 272, 675, 14 L. R. A. 755) ; or, in case there is a failure to give any bond, the jurisdiction of the court or body conducting the proceeding is in nowise affected.   (*State* v. *Taylor,* 224 Mo. 393, 123 S. W. 892.)

4. Section 42 of the Act provides: ''All bonds issued under this Act   *   *   *   shall be signed by the president and attested by the secretary of the board under the corporate seal of the district.''   Section 43 declares that such bonds shall be a lien upon all the lands originally, or at any time, included in the district.   In section 44 is found this provision: ''Bonds issued hereunder shall be issued, negotiated and sold by or under the direction of the board of commissioners, but shall never be sold for less than ninety per cent (90%) of their par value and accrued interest thereon to date of delivery.   Any bonds issued hereunder may, in the discretion of the board of commissioners, be issued direct in payment and satisfaction of the contract or purchase price of any irrigation works, canals, water, water rights, or other property constructed or acquired by or for the district.''

The order of the board was made on February 15, 1910, and fixed January 1, 1910, as the date from which the thirty year term of the bonds should run. When the order was confirmed [6] by the district court, E. A. Richardson and T. V. H. Collins, members of the board and acting, respectively, as its president and secretary, executed and sealed the bonds in conformity with the requirements of section 42. Subsequently—the exact date does not appear—they went out of office. On July 5, 1910, the new board delivered to the company $83,500 of the bonds, in exchange for its property, and at the time this action was brought were proposing to put upon the market and sell and deliver to the purchasers the others remaining in their hands, amounting to $166,500. It is contended that, since the persons who executed the bonds have since gone out of office, none of them are valid obligations of the district. In other words, to constitute valid and legal obligations, it is contended that all of them must, at the time of their delivery, have been signed [7] and attested by the persons then acting as president and secretary. It is said that the word "issued," as used in the statute, has reference to the date of actual delivery to the purchaser, and hence the view contended for must obtain. We agree with counsel that the word "issue," as here used, means the delivery of the bonds to the purchaser, and has no reference to the arbitrary date fixed as the beginning of the time for which they run. The word "issue," used in connection with bonds, notes, etc., sometimes, and perhaps generally, refers to this date; but evidently bonds cannot be a lien upon the property of the obligor until they have been delivered, nor can they be issued directly in payment and in satisfaction of a contract without actual delivery. Hence we conclude that the term, as here used, refers to the actual delivery or emission of the evidences of indebtedness. Indeed, there is no reasoning or authority which can justify the conclusion that a change in the personnel of the executive officers of a municipality—a continuing entity—which occurs after the execution of its obligations, can affect the validity of the completed act of execution. No case directly in point has been called to our attention, and we

know of none. To uphold the contention of counsel would be to hold that, upon every change in the personnel of the officers wrought by death, removal, resignation, or expiration of their current term, there must be other bonds prepared and executed by their successors, however short the time which may have intervened. It is not unusual that delays occur in connection with the issuance and sale of municipal bonds, and we know from personal observation that causes for such delay, which cannot be foreseen, often intervene after all necessary steps have been taken looking to their issuance, except the actual delivery of them. In the absence of a provision in the statute expressly or by strong implication requiring the adoption of the rule contended for, we decline to recognize it.

5. It appears that the bonds delivered to the company, in amount $83,500 face value, with interest coupons attached, were delivered as the equivalent of $75,210, the cash purchase price of the property of the company fixed by stipulation between it and the board of commissioners. The contention is made that, though the board had authority to sell bonds for cash at a discount of ten per cent of their face value and accrued interest at the date of delivery, it could not allow such discount when bonds were issued directly in payment of the purchase price of property. It is also said that, in any event, the board, in delivering the bonds to the company without detaching the coupons representing the interest accrued at the date of delivery, exceeded its authority by allowing the company a greater discount than permitted by the statute. The first of these contentions is without merit.

It is the general rule that, when a municipality is given authority to issue and sell its bonds, it must observe the restrictions, if any, as to the mode by which, and the terms upon which, [8] they may be sold. But when the power is granted without restriction, the authorities of the municipality are left free to dispose of them at such prices as they can obtain. They have the implied power to agree upon the terms of sale. (*Lynchburg* v. *Slaughter*, 75 Va. 57.) No restriction is imposed by the statute upon the board in making exchange of bonds for

property, other than that imposed upon them in making a sale for cash. In *Cady* v. *City of Watertown*, 18 Wis. 328, one of the questions was whether bonds of the city delivered by the commissioners named in the Act, clothing them "with full power to negotiate the sale" in exchange for schoolhouse sites and for labor and material for the erection of a bridge, was a sale of such bonds within the meaning of the Act. The court said: "We have no doubt that the disposition made of the bonds by the commissioners was a sale of them within the meaning and intent of the Act, and was a proper execution of the power." [9] . So we think that an exchange of the bonds of the district for the property of the company at its cash value was a sale of them, the same as if they had been sold for cash, and that the commissioners were authorized to so sell them, subject only to the limitations to be observed in making sales for cash.

The second contention, we think, has merit. The statute, *supra,* fixes the basis upon which the discount may be allowed [10] as the face value and accrued interest. Therefore, the commissioners, in delivering the bonds to the company, actually sold to it bonds to the amount of $86,060.66 at the price of $75,210, giving it the advantage of $2,560.66, the face value of the coupons due at the time of sale. This they had no authority to do. This fact, alleged in the complaint and admitted by the demurrer, the prayer demanding relief in this behalf, entitles the plaintiff *prima facie* to a decree requiring either that the company surrender the coupons for cancellation, or, in case it appears that they have been paid, that it refund the amount of them to the district, with legal interest from the date of payment. Accordingly, the judgment is reversed and the cause remanded, with directions to the district court to overrule the demurrer.

*Reversed and remanded.*

MR. JUSTICE SMITH and MR. JUSTICE HOLLOWAY concur.